Filed 12/20/23 Martin v. Martin CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| WAYNE MARTIN, as Trustee, etc., et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>ROSE MARIE MARTIN,<br><br>     Defendant and Appellant. | A165522<br><br>(Alameda County<br>Super. Ct. No. RP 20060879) |

Appellant Rose Marie Martin (appellant) and respondents Wayne and Marvin Martin (Wayne and Marvin, or respondents) are the living children of Rose Lee Martin (Rose).[1]  Rose executed the Rose L. Martin Trust (Trust) in 2006, naming her children equal beneficiaries and naming Wayne the initial successor trustee.  In December 2009, Rose executed an Amendment to the Trust (Amendment).  The Amendment left a residence on Bellevue Avenue in Daly City (Bellevue Residence) to appellant and named her the initial successor trustee.  The Bellevue Residence was the only Trust asset at the time of Rose's death in 2020.  Following Rose's death, respondents challenged the validity of the Amendment and sought damages for misappropriated Trust funds.  Appellant appeals from the trial court's judgment invalidating

[1] We refer to family members by their first names for convenience.  No disrespect is intended.

1

the Amendment and surcharging her in the amount of $572,299.66.  We affirm.

## BACKGROUND

Rose and her husband Allen Martin (Allen) acquired the Bellevue Residence in April 1959.  They had four children:  James Martin (James), appellant, and respondents Wayne and Marvin.  In June 2004, James moved in with Rose and Allen to help care for Allen.  Allen passed away in February 2005.

In 2006, Rose executed the Trust during a meeting attended by all her children.  Rose made the children equal beneficiaries of the Trust after her death and named Wayne the initial successor trustee.

James continued to live with Rose after Allen's death, and he provided a range of caretaking services to her.  In May 2008, James was killed in a hit-and-run accident.

According to a letter appellant sent in March 2010, Rose's "cognitive skills declined and her confusion greatly increased after James was killed."  In a letter to Rose's physician in September 2008, appellant asked the physician to write a letter verifying James was Rose's primary caregiver and including "the fact that [Rose] has mild dementia and is incapable of living on her own, which she is."

In May 2009, Rose moved to appellant's home.  After the move, Rose was unable to recognize respondents without prompting from appellant.  In July, appellant sent respondents an e-mail stating that Rose "does have Alzheimer's rather than age-related dementia."  Appellant added that Rose thought appellant was "her sister on most days."

After the move, appellant rented out the Bellevue Residence.  Between October and December 2009, appellant had four to five conversations with

2

Rose about amending the Trust; appellant initiated the first conversation. Prior to those conversations, Rose had not indicated she wanted to make changes to the Trust. Appellant contacted a document preparing service to arrange a meeting to amend the Trust. Before the meeting, appellant prepared notes stating that Rose wanted to name appellant the initial successor trustee, that Rose wanted appellant to inherit the Bellevue Residence, and that the Bellevue Residence should pass to appellant's daughter should appellant predecease Rose.

On November 17, 2009, appellant drove Rose to a meeting with the document preparer. Appellant was present during the entire meeting, and she presented her notes to the document preparer. After the Amendment was drafted, appellant drove Rose to the December 8 meeting to sign the Amendment and was present during the entire meeting. Appellant testified she did not remember Rose asking any questions and she was unsure if Rose read the Amendment before signing it. Appellant signed the check to pay for the Amendment. The Amendment left the Bellevue Residence to appellant (and to her daughter if appellant predeceased Rose) and named appellant the initial successor trustee. Appellant did not tell respondents about the Amendment.

In December 2010, appellant took Rose to see her primary care physician, and appellant expressed concern about Rose's memory loss over the last three years. A neurologist examined Rose later the same month. Among other things, appellant reported that Rose had a memory problem "for at least two years, probably at least four or five," and that Rose had "[f]or several years . . . needed supervision for medication and finances." The neurologist's notes state that Rose sat passively while appellant discussed the situation. Rose could only name two of four objects and did not know the

3

day of the week, the year, the president, or the state. The neurologist diagnosed Rose with "Alzheimer's with slow progression and [s]ome real significant word finding problem." Rose permanently moved into a residential care home in 2013.

In December 2014, appellant obtained a $150,000 line of credit secured by the Bellevue Residence. Appellant signed for Rose using her power of attorney. Appellant deposited funds from the line of credit into a joint account (owned by appellant and Rose) at Bank of the West (Joint Account). Appellant also deposited rent from the Bellevue Residence and Rose's social security income into the Joint Account. In 2018, appellant obtained a $213,000 loan to refinance the line of credit, signing as trustee for the Trust. In August 2019, appellant obtained another $300,000 line of credit secured by the Bellevue Residence. Appellant signed as trustee of the Trust and also signed for Rose using her power of attorney. Appellant used funds in the Joint Account to pay for appellant's mortgage and property tax, utilities, credit card bills, and cell phone.

Rose died in February 2020. The only asset in the Trust at the time was the Bellevue Residence; the Joint Account was not part of the Trust.

In May 2020, respondents filed a petition to determine the validity of the Amendment, and, in May 2021, respondents filed an amended petition. Among other things, respondents sought invalidation of the Amendment and damages for funds misappropriated by appellant.

The trial court conducted a trial in January and February 2022. The court received briefs from the parties following trial and issued a tentative decision in March. Appellant filed objections to the tentative decision, and the trial court issued a statement of decision (Decision) in April. The Decision invalidated the Amendment "as the product of undue influence" and

replaced appellant as trustee. The Decision also surcharged appellant for losses resulting from appellant's breach of fiduciary duties. Because the court found that double damages were warranted under Probate Code[2] sections 859 and 4231.5, appellant was surcharged in the amount of $572,299.66 (damages in the amount of $286,149.83, doubled).[3]

In June 2022, the trial court denied appellant's motion for a new trial and issued a judgment in accordance with the Decision. The present appeal followed.

## DISCUSSION

I. *The Trial Court's Decision Does Not Lack a Bad Faith Finding*

Section 859 provides: "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a conservatee, a minor, an elder, a dependent adult, a trust, or the estate of a decedent, or has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the person shall be liable for twice the value of the property recovered by an action under this part." The statute unambiguously requires a finding of bad faith before imposition of double damages for a wrongful taking of trust property or a taking through undue influence.

---

[2] All undesignated statutory references are to the Probate Code.

[3] The Decision states, "The surcharge against [appellant] likely will be and should be satisfied through the proceeds from the sale of the trust real property. . . . the court finds it is equitable that the surcharge (damages and double damages) shall earn interest from the date of this order only to the extent that the surcharge cannot be entirely satisfied from the net proceeds of sale of the trust real property."

5

(*Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1129 (*Keading*); *Levin v. Winston-Levin* (2019) 39 Cal.App.5th 1025, 1034.)

In the present case, the trial court found in its Decision "that the undue influence committed by [appellant] was in bad faith. While some aspects of the influence likely were unconscious projections of [appellant's] own desire, the attempt to benefit [appellant's] daughter to the exclusion of her siblings is evidence of a knowing intent to cause financial damage and harm to her siblings. The court also finds that use of a joint tenancy account also was intended to ensure that [appellant] would effectively secure all resources of [Rose] to the exclusion of [appellant's] siblings. Accordingly, this court finds that double damages are warranted pursuant to" sections 859 and 4231.5.

On appeal, appellant states he "agrees with [r]espondents that the trial court made a finding of undue influence with regards to the invalidation of the trust amendment. However, [a]ppellant does not agree that the trial court made a finding of undue influence 'in bad faith' with regards to the financial transactions" that constituted the takings encompassed by section 859.[4] But it is clear that the reference to "undue influence" in that portion of the Decision is to "undue influence" as used in section 859 and not to "undue influence" as to the Amendment. Section 859 provides for double damages in three situations: (1) where " 'a person has in bad faith wrongfully taken, concealed, or disposed of property,' " (2) where a person " 'has taken, concealed, or disposed of the property by the use of undue influence in bad faith,' " or (3) where "a person 'has taken, concealed, or disposed of the

---

[4] Appellant also argues double damages could not be awarded under section 4231.5 without a finding of bad faith. Because we conclude double damages were properly awarded under section 859, we need not address section 4231.5.

6

property . . . through the commission of elder or dependent adult financial abuse.'" (*Keading, supra*, 60 Cal.App.5th at pp. 1128–1129.) The parties agree the Decision awarded double damages for takings by the use of undue influence, rather than for either of the other two types of takings. Accordingly, the Decision's language that "the undue influence committed by [appellant] was in bad faith" closely tracks the section 859 statutory language ("the use of undue influence in bad faith"). Nothing in the Decision suggests that the bad faith finding relates only to undue influence in obtaining the Amendment rather than in accomplishing the financial transactions. Appellant's claim that the trial court failed to make the required finding of bad faith fails.[5]

II.    *Appellant's Challenge to the Undue Influence Finding Regarding the Amendment Fails*

    A.    *Appellant's Challenge is Waived*

    " 'The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant

___

[5] Appellant does not set forth any substantial argument that the court's finding of bad faith as to the takings by undue influence is not supported by substantial evidence. She does assert the trial court's comments about the good care she provided Rose are contrary to any finding of bad faith. We see no inconsistency in the two findings—the court reasonably could conclude that appellant faithfully cared for Rose's needs, and also in bad faith misappropriated funds from Rose's estate. Appellant cites no authority to the contrary. Appellant also argues there were no allegations of "isolation, neglect, physical or emotional abuse, [or] malice," but she cites no authority any such circumstances are necessary to support a finding of bad faith. Finally, appellant argues her use of the Joint Account was "simply continuing the same custom and practice" Rose used with James before his death. But the trial court could reasonably make a different inference, given that appellant "directed income and assets of [Rose] to herself" and "paid for her own personal expenses using [Rose's] income and assets . . . ."

7

who contends that some particular finding is not supported is required to set forth in [their] brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings.' " (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 (*Fink*); accord, *In re Marriage of Dalgleish & Selvaggio* (2017) 17 Cal.App.5th 1172, 1183 (*Dalgleish & Selvaggio*); *Doe v. Roman Cath. Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 (*Cashel & Emly*).)

As respondents point out, appellant has failed to do so. Instead, her "opening brief sets forth only [her] version of the evidence, omitting any reference to the conflicting evidence submitted by [respondents], as described in our statement of facts." (*Cashel & Emly*, *supra*, 177 Cal.App.4th at p. 218.) For example, appellant's opening brief fails to cite any of the evidence of Rose's cognitive problems, including appellant's own statements describing those difficulties. Instead, the brief asserts that, prior to 2010, Rose "had never received a diagnosis of any cognitive impairment." That may be technically correct, but it is misleading in light of the extensive evidence of actual impairment. Appellant's opening brief also fails to reference the evidence that she did not inform respondents of the Amendment, or the evidence that she spent Trust money from the Joint Account on personal expenses. In her discussion of the sufficiency of the evidence to support the trial court's undue influence finding, appellant attacks the expert testimony regarding Rose's impairment, but she fails to summarize portions of that testimony contrary to her argument or the other evidence supporting the court's finding of impairment. In her discussion of the sufficiency of the evidence to support the court's finding that appellant actively participated in

8

procuring the Amendment, appellant summarizes the evidence recited in the Decision, but she fails to provide citations to the underlying evidence in the record.

In their brief on appeal, respondents pointed out the deficiency in appellant's opening brief, but appellant failed to address the issue in her reply. "Because [appellant] has failed in [her] obligations concerning the discussion and analysis of [the] substantial evidence issue, we deem" her challenge to the sufficiency of the evidence supporting the undue influence finding "waived." (*Cashel & Emly*, *supra*, 177 Cal.App.4th at p. 218; see also *Fink, supra*, 25 Cal.3d at p. 888 ["we summarily reject [appellant's] arguments based upon a lack of substantial evidence"].)

B.    *In Any Event, Appellant's Claim Fails*

Even if appellant had not waived her argument, "only a brief review of the trial court's findings is necessary to find abundant evidence supporting the court's ruling." (*Dalgleish & Selvaggio, supra*, 17 Cal.App.5th at p. 1183.)

"Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency. [Citations.] [¶] . . . Although a person challenging the testamentary instrument ordinarily bears the burden of proving undue influence (§ 8252), . . . a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96–97.)  In the present case, the trial court expressly found a presumption of undue influence existed as to the Amendment, based on

9

evidence "(1) that there [was] a confidential relationship between [Rose and appellant], (2) that [appellant] received an undue benefit via the trust amendment, and (3) that [appellant] actively participated in procuring or executing the disputed trust amendment." Of those findings, appellant disputes only the finding that she actively participated in procuring the Amendment.

Proof of active participation "exists where the evidence is of such a nature as to warrant the inference that the will was the direct result of the influence exerted for the purpose of procuring it, and was not the natural result of the uncontrolled will of the testatrix." (*Estate of Baker* (1982) 131 Cal.App.3d 471, 481.) In making its finding, the trial court explained that appellant "admitted that she initiated the contact and had pre-meeting conversations" with the document preparer; "admitted that she provided the Document Preparer with typed notes that she prepared indicating changes in the trust that the Document Preparer was to make"; "admitted that she initiated several conversations" about the Trust with Rose; and "drove [Rose] to, and was present with [Rose] at, all meetings . . . including the meeting at which the disputed instrument was signed." The court also observed, "There is no evidence that [Rose] met privately with the Document Preparer, or with an attorney during the development and execution of the disputed trust amendment." Appellant does not dispute that the record supports all of those characterizations of the evidence. Instead, she argues, "it is well-settled that these actions can – and often do – occur without a finding of undue influence." But the issue is whether there was evidence of active participation sufficient to support the *presumption* of undue influence, not whether the evidence of active participation *showed* undue influence.

Appellant cites to cases presenting various fact patterns on the

10

question of active participation. Those cases are of little assistance because the determination is highly case specific. Appellant cites to no case holding that a collection of circumstances such as those referenced by the trial court in the present case is insufficient to support a finding of active participation. (Cf. *Estate of Anderson* (1921) 185 Cal. 700, 717 ["The only evidence of such activity is that she obtained a letter of introduction to the lawyer who prepared the draft of the will and went with the testatrix to his office and there remained in an outer room during the interview between the testatrix and the lawyer."]; *Estate of Mann* (1986) 184 Cal.App.3d 593, 608 ["appellant was not present during [the attorney's] main discussion with decedent regarding the substance of the will"]; *Estate of Goetz* (1967) 253 Cal.App.2d 107, 116 [the decedent "gave her instructions for drafting the will"]; *Estate of Lombardi* (1954) 128 Cal.App.2d 606, 613 ["Testatrix herself called the attorney. She alone talked to the attorney and furnished the data for her will."]; *Estate of Llewellyn* (1948) 83 Cal.App.2d 534, 565 ["appellant was not in the room when the contents of the will were discussed, nor when the testamentary document was executed"]; *Estate of Hull* (1944) 63 Cal.App.2d 135, 142 ["the only evidence of activity on the part of the proponent of the will is that . . . the proponent contacted a lawyer at the request of the testatrix"].) Appellant has not shown the trial court erred in applying the presumption of undue influence.

In arguing the presumption was overcome,[6] appellant argues the trial court "chose to weigh heavily the highly speculative testimony of

---

[6] Appellant ignores the presumption and argues no substantial evidence supports the finding of undue influence, but appellant had the burden to overcome the presumption and we frame the issue accordingly. (See *Camperi v. Chiechi* (1955) 134 Cal.App.2d 485, 504 [the presumption of undue influence "may be overcome where it is manifest that the grantor acted

11

Respondents' expert Dr. Stephen Raffle . . . who did not review any contemporaneous records and never personally examined" Rose. Dr. Raffle opined in his testimony that, based on his review of medical records, Rose was substantially impaired and "susceptible to undue influence due to both medical and psychiatric causes" when the Amendment was executed in 2009. Appellant points out that Dr. Raffle testified that he did not review any medical records prior to December 2010; that he could not "state with medical certainty" that Rose lacked capacity to administer the Trust at the time of execution of the Amendment; that she had "testamentary capacity" in 2009; and that she was not "severely demented" or "severely impaired" until 2014. But appellant cites no authority that a finding of undue influence requires evidence of lack of capacity or severe dementia. Indeed, Dr. Raffle testified that Rose's testamentary capacity in 2009 did not affect his opinion regarding her substantial impairment and susceptibility to undue influence. He explained, "I was asked to refer to a particular code section that I'm familiar with that has criteria for testamentary capacity that does not include substantial impairment." Dr. Raffle's testimony was evidence the trial court could properly rely upon in making its undue influence determination.[7]

voluntarily and with full understanding, and that the benevolent act was engendered in the testator's own mind without overreaching or improper importunity on the part of the grantee"].)

[7] We note that appellant's briefs omit reference to other evidence of Rose's impairment described in respondents' brief. Appellant's brief also omits other portions of Dr. Raffle's testimony that explained why various circumstances made Rose susceptible to undue influence. In addition to her progressive dementia, these included depression following the deaths of Allen and James, confusion, dependence on appellant after the move to appellant's home, and dependence due to appellant's management of her finances. To the extent appellant argues in her opening brief that Dr. Raffle's testimony was inadmissible, we need not address that issue because appellant's reply

Finally, appellant argues, "the trial court made no finding of isolation, malice, verbal or physical abuse, or duress." But appellant cites no authority for the proposition that any such findings are necessary for a finding of undue influence, much less that appellant can *overcome the presumption of undue influence* by pointing to the absence of such findings.[8] Appellant has not shown the trial court erred in finding the Amendment was the product of undue influence.[9]

## DISPOSITION

The trial court's judgment is affirmed. Costs on appeal are awarded to respondents.

---

failed to address the detailed arguments on that issue in respondents' brief. We will not develop appellant's arguments on her behalf. (*SI 59 LLC v. Variel Warner Ventures, LLC* (2018) 29 Cal.App.5th 146, 156 (*Variel Warner*).)

[8] Appellant also argues the trial court disregarded the notary's testimony that he has refused to notarize a document on "very, very rare occasions," but he did not refuse to notarize the Amendment in the present case. The trial court did not err in giving more weight to other evidence in the case. Appellant also makes arguments about the trial court's characterizations of the attorney involved in creation of the Amendment, but those comments are not relevant to our analysis. Neither is it necessary to discuss appellant's arguments that suggest the trial court should have made different inferences from various circumstances, such as the decision to move Rose into appellant's home and the lack of an evident reason for the change in disposition in the Amendment. The court was entitled to draw its own reasonable inferences from the evidence.

[9] We need not and do not address the arguments in appellant's opening brief regarding judicial bias, excessiveness of damages, admission of certain testimony by respondent Wayne, admission of certain demonstrative exhibits, and an alleged ambiguity in the judgment. Appellant's reply entirely failed to address the detailed rebuttals to those arguments made in respondents' brief, and " '[i]t is not our responsibility to develop an appellant's argument.' " (*Variel Warner*, *supra*, 29 Cal.App.5th at p. 156.)

13

SIMONS, ACTING P. J.

WE CONCUR:

BURNS, J.

CHOU, J.

A165522
*Martin v. Martin*

14